NO. 15-2169

# In The
# United States Court of Appeals
# For The Third Circuit

-----------------------------------------------------------------------------------------------------------------------

## UNITED STATES OF AMERICA, *ex rel.*
## Customs Fraud Investigations, LLC,

*Plaintiff – Appellant*,

v.

## Victaulic Company,

*Defendant – Appellee*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————

### OPENING BRIEF OF APPELLANT

———————————

| | |
|---|---|
| Jonathan K. Tycko | Suzanne I. Schiller |
| Anna C. Haac | MANKO, GOLD, KATCHER & FOX, LLP |
| TYCKO & ZAVAREEI LLP | 401 City Avenue |
| 2000 L Street, NW, Suite 808 | Suite 901 |
| Washington, DC 20036 | Bala Cynwyd, PA 19004 |
| (202) 973-0900 | (484) 430-2354 |
| | |
| *Counsel for Appellant* | *Counsel for Appellant* |

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Customs Fraud Investigations, LLC ("CFI") does not have a parent corporation and no publicly held corporation owns 10% or more of CFI's stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................iv

STATEMENT OF JURISDICTION ............................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................1

STATEMENT OF RELATED CASES..........................................3

STATEMENT OF THE CASE .....................................................3

    I.    Procedural History ......................................................3

    II.    Facts Relevant To Issues On Review .........................5

SUMMARY OF ARGUMENT.................................................12

STANDARD OF REVIEW......................................................14

ARGUMENT.........................................................................15

    I.    The District Court Erred In Holding That CFI Failed
            To Allege A Violation Of The False Claims Act ...................15

        A.    The Plain Language Of The FCA And Tariff
              Act Show That Evasion Of Marking Duties Is
              Actionable Under The FCA............................................15

        B.    The Above Plain Language Reading Is
              Consistent With Congressional Intent To Make
              Knowing Failure To Pay Marking Duties
              Actionable Under The FCA And To Overrule
              The Marking Duties Holding Of ATMI .........................18

        C.    The District Court Incorrectly Reasoned That
              The Words "Conceal, "Avoid" Or "Decrease"
              Take Marking Duties Outside The Scope Of
              The FCA. ..................................................................24

        D.    Contrary To The District Court's Conclusion,
              Importers Have A Duty To Disclose Marking
              Violations................................................................27

II.  The FAC Satisfied The "Particularity" Standard Of
Fed. R. Civ. P. 9(b). ...................................................36

III.  The District Court's Dismissal "With Prejudice" and
Subsequent "Undue Delay" Ruling Constituted An
Abuse Of Discretion ...................................................43

IV.  The Original Complaint Also Stated A Claim For
Relief, And The District Court's Dismissal Of That
Complaint Was A Misapplication Of The
"Plausibility" Standard.............................................51

A.  CFI's Allegations Easily Satisfy The
Plausibility Standard Because They
Demonstrate, To A 99.9% Degree Of Certainty,
That Victaulic Has Sold Massive Quantities Of
Unmarked Pipe Fittings.................................................52

B.  The District Court Improperly Speculated That
Victaulic May Have Paid Marking Duties,
Erroneously Reversing The Plausibility
Standard To Require CFI To Disprove A
Remote Possibility Of Lawful Conduct. ......................55

CONCLUSION.............................................................58

# TABLE OF AUTHORITIES

## Cases

*Adams v. Gould Inc.*,
  739 F.2d 858 (3d Cir. 1984) ................................................................. 15, 45-46

*Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ........................................................... passim

*Arthur v. Maersk*,
  434 F.3d 196 (3d Cir. 2006) ............................................................45-46, 48-49

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................. passim

*Bechtel v. Robinson*,
  886 F.2d 644 (3d Cir. 1989) .................................................................48

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................passim

*Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263 (3d Cir. 2008)...............................50

*Bonkowski v. Oberg Indus., Inc.*,
  787 F.3d 190 (3d Cir. 2015) ........................................................ 16-17

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .................................................................56

*Ca. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .................................................................50

*CMR D.N. Corp. v. City of Phila.*,
  703 F.3d 612 (3d Cir. 2013) .................................................................46

*Cotonificio Bustese, S.A. v. Morgenthau*,
  121 F.2d 884 (D.C. Cir. 1941) .................................................................18

*Cornell & Co. v. Occupational Safety & Health Review Comm'n*,
  573 F.2d 820 (3d Cir. 1978) .................................................................47

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) .................................................................44

*Cureton v. Nat'l Collegiate Athletic Ass'n*,
  252 F.3d 267 (3d Cir. 2001) ................................................................. 44, 48, 50

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
  539 F.3d 199 (3d Cir. 2008) ................................................................. 15

*Douglass v. Convergent Outsourcing*,
  765 F.3d 299 (3d Cir. 2014) ................................................................. 26

*Estate of Arrington v. Michael*,
  738 F.3d 599 (3d Cir. 2013) ................................................................. 18-19

*Estate of Oliva ex rel. McHugh v. New Jersey*,
  604 F.3d 788 (3d Cir. 2010) ................................................................. 46

*Foglia v. Renal Ventures Mgmt., LLC*,
  754 F.3d 153 (3d Cir. 2014) ................................................................. passim

*Foman v. Davis*,
  371 U.S. 178 (1962) ................................................................. 50

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ................................................................. 43, 52

*Frontier Ins. Co. v. United States*,
  185 F. Supp. 2d 1375 (Ct. Int'l Trade 2002) ................................................................. 32-33

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ................................................................. 50

*Jang v. Bos. Scientific Scimed, Inc.*,
  729 F.3d 357 (3d Cir. 2013) ................................................................. 50

*Kennard v. Comstock Res., Inc.*,
  363 F.3d 1039 (10th Cir. 2004) ................................................................. 42

*Lorenz v. CSX Corp.*,
  1 F.3d 1406 (3d Cir. 1993) ................................................................. 50

*McCauley v. City of Chicago*,
  671 F.3d 611 (7th Cir. 2011) ................................................................. 56

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
   331 F.3d 406 (3d Cir. 2003) ................................................................36

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013) ................................................................56

*Philips v. County of Allegheny*,
   515 F.3d 225 (3d Cir. 2008) ................................................................44

*Ratzlaf v. United States*,
   510 U.S. 135 (1994) ............................................................................19

*Rosenberg v. XM Ventures*,
   274 F.3d 137 (3d Cir. 2001) .......................................................... 15-16

*Runnion ex rel. Runnion v. Girl Scouts*,
   786 F.3d 510 (7th Cir. 2015) ..............................................................44

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ............................................................56

*Travelers Indem. Co. v. Dammann & Co.*,
   594 F.3d 238 (3d Cir. 2010) ...............................................................15

*United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*,
   149 F.3d 227 (3d Cir. 1998) ...............................................................15

*United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*,
   769 F.3d 837 (3d Cir. 2014) ........................................................ 15, 50

*United States ex rel. Bahrani v. ConAgra, Inc.*,
   465 F.3d 1189 (10th Cir. 2006) ..........................................................22

*United States ex rel. Bain v. Georgia Gulf Corp.*,
   386 F.3d 648 (5th Cir. 2004) ..............................................................22

*United States ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) ..............................................................39

*United States ex rel. Huangyan Imp. & Exp. Corp. v.
   Nature's Farm Prod., Inc.*,
   370 F. Supp. 2d 993 (N.D. Cal. 2005) ..................................... 22-23, 27

*U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*,
   473 F.3d 506 (3d Cir. 2007) ................................................................42

*United States v. Fontaine*,
   697 F.3d 221 (3d Cir. 2012) ..............................................................26

*United States v. Great N. Ry.*,
   287 U.S. 144 (1932) ...........................................................................19

*United States v. Quick Int'l Courier, Inc.*,
   131 F.3d 770 (8th Cir. 1997) ..............................................................22

*Wausau Underwriters Ins. Co. v. Shisler*,
   190 F.R.D. 341 (E.D. Pa. 1999) .........................................................46

## Statutes and Rules

19 U.S.C § 1304 ............................................................................ passim

19 U.S.C. § 1484 ................................................................... 28-29, 35

19 U.S.C. § 1504(a) .................................................................................34

19 U.S.C. § 1505(a) .................................................................................34

19 U.S.C. § 1592 .............................................................. 18, 21, 29-30, 35

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

31 U.S.C. § 3729 ........................................................................... passim

31 U.S.C. § 3730(e)(4) .............................................................................3

31 U.S.C. § 3732 ........................................................................................1

19 C.F.R. § 134.3(a) ...............................................................................29

19 C.F.R. § 134.51 ......................................................................... 11, 32-33

19 C.F.R. § 134.52 ............................................................................ 32-33

19 C.F.R. § 141.0(a-b) ...........................................................................29

19 C.F.R. § 141.101 ...................................................................................34

19 C.F.R. § 141.103 ...................................................................................34

19 C.F.R. § 159.11 .....................................................................................34

19 C.F.R. § 18.25 .......................................................................................31

19 C.F.R. § 144.37 .....................................................................................31

19 C.F.R. §  Pt. 171, App. B .....................................................................30

Fed. R. App. P. 4(a)(1)(B) ...........................................................................1

Fed. R. Civ. P. 8(a).................................................................. 2, 4, 52, 57-58

Fed. R. Civ. P. 9(b) ........................................................................... passim

Fed. R. Civ. P. 12(b)(1)..................................................................................3

Fed. R. Civ. P. 12(b)(6) ................................................................. 3-4, 44, 57

Fed. R. Civ. P. 15(a)....................................................................1-2, 14, 43-44

Fed. R. Civ. P. 59(e).......................................................................... 1, 44, 49

Fraud Enforcement and Recovery Act of 2009,
  Pub. L. No. 111-21, 123 Stat 1617 (May 20, 2009)................................... passim

North American Free Trade Implementation Act,
  Pub. L. No. 103-82, 107 Stat. 2057 (1993) ................................... 28, 35

## <u>Other Authorities</u>

S. Rep. No. 98-308 (1983)
  *reprinted in* 1984 U.S.C.C.A.N. 4910.................................................17

S. Rep. No. 110-507 (2008) ............................................................. 20-21

S. Rep. No. 111-10 (2009)
  *reprinted in* 2009 U.S.C.C.A.N. 430...........................................20-21

155 Cong. Rec. S4539, 2009 WL 1077017 (daily ed. April 22, 2009)...................22

Customs Ruling, HQ 735472, 1994 WL 896594 (July 8, 1994) ............................32

Customs Ruling, HQ H077355, 2009 WL 5488688 (Oct. 28, 2009) .....................32

Customs Ruling, HQ 733856, 25 Cust. B. & Dec. 307,
    1991 WL 544155 (Mar. 8, 1991) ........................................................................33

Customs Ruling, HQ 734282, 1992 WL 313523 (Feb. 10, 1992) ................... 32-34

Customs Ruling, HQ 734291, 26 Cust. B. & Dec. 406,
    1991 WL 537178 (Aug. 26, 1991) ......................................................................33

Customs Ruling, HQ 967982, 2006 WL 1555426 (Feb. 7, 2006) ..........................33

U.S. Customs and Border Protection, Pub. 0000-0504,
    Importing into the United States: A Guide for Commercial Importers 12-13
    (2006) ("Customs Pub. 0000-0504") ...................................................................31

U.S. Customs and Border Protection, Pub. HB 3500-11,
    Bonded Warehouse Manual for Customs and Border Protection Officers and
    Bonded Warehouse Proprietors 41, 52 (2012) ...................................................31

5B C. Wright & A. Miller,
    *Federal Practice and Procedure* § 1357 (3d ed. 2015). .....................................45

6 C. Wright & A. Miller,
    *Federal Practice and Procedure* § 1473 (3d ed. 2015) ......................................43

6 C. Wright & A. Miller,
    *Federal Practice and Procedure* § 1488 (3d ed. 2015) ......................................47

Brief of United States in *United States v. Trek Leather, Inc.*,
    No. 2011-1527, 2014 WL 2738331 (Fed. Cir. June 2, 2014) ..............................29

William J. Kovatch, Jr., *The Duty of "Reasonable Care" Under the Customs
    Modernization Act of 1993*, 28 Denv. J. Int'l L. & Pol'y 73 (1999) .......... 28-29

Timothy G. Moran, *Customs A' La Mode*, Vt. B.J. & L. Dig. (1997) ..................29

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  On September 4, 2014, the district court entered an order and memorandum dismissing the original Complaint filed by plaintiff/relator Customs Fraud Investigations, LLC ("CFI").  JA 4, 5-49.  CFI then timely filed a motion under Fed. R. Civ. P. 59(e) and Fed. R. Civ. P. 15(a) to alter or amend the judgment and for leave to file an amended complaint, thereby tolling the time for appeal.  Fed. R. App. P. 4(a)(1)(B).  The district court denied that motion by order and memorandum entered on April 10, 2015.  JA 50, 51-101.  CFI filed a notice of appeal on May 8, 2015.  JA 1-3.  This appeal is from a final order that disposes of all parties' claims.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      If an importer evades marking duties owed under the Tariff Act, 19 U.S.C. § 1304(i), by knowingly failing to disclose to U.S. Customs and Border Protection ("Customs") that imported goods are not marked with country-of-origin, and by knowingly failing to pay those duties when they accrue, does that give rise to liability under the "reverse false claims" provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(G)?  JA 74-88.

2.      Given that CFI's First Amended Complaint ("FAC") alleged, among other things, the details of Victaulic's scheme to evade marking duties, identified

the specific imports for which such duties should have been paid, alleged the details of CFI's studies of the secondary market for Victaulic's products, and incorporated the sworn declaration of a Professor of Statistics that CFI's studies proved Victaulic's violations to a near certainty, was the district court's holding that the FAC failed to satisfy the "particularity" standard of Fed. R. Civ. P. 9(b) incorrect and inconsistent with *Foglia v. Renal Ventures Management, LLC*, 754 F.3d 153 (3d Cir. 2014)?  JA 88-101.

3.      In light of the dictate of Fed. R. Civ. P. 15(a)(2) that "[t]he court should freely give leave [to amend] when justice so requires," was it error for the district court to deny leave to file the FAC, on grounds of "undue delay," when CFI sought leave for the first time promptly after the district court granted Victaulic's motion to dismiss the original complaint, and Victaulic neither asserted nor demonstrated any prejudice?  JA 69-74.

4.      Given that CFI's original Complaint contained factual allegations that Victaulic knowingly imported massive quantities of pipe fittings from China and other countries, that these pipe fittings were not marked with country-of-origin, and that Victaulic neither disclosed the lack of marking to Customs nor paid the marking duties it owed, did the district court err in holding that those allegations failed to satisfy Fed. R. Civ. P. 8(a) on grounds that the court believed that CFI's underlying statistical analysis in support of these allegations was "merely

2

consistent with" Victaulic deliberately failing to mark its imported pipe fittings,

but did not prove that Victaulic had, in fact, violated the FCA?  JA 42-48.

## STATEMENT OF RELATED CASES

CFI is not aware of any previous or pending appeals arising out of this same

case or proceeding.

## STATEMENT OF THE CASE

## I.    Procedural History

On May 30, 2013, CFI filed its original Complaint.  The Complaint alleged

that Victaulic knowingly engaged in a scheme with twin goals: (1) to import

massive quantities of pipe fittings that it manufactured in China and other foreign

countries, without marking those pipe fittings with their country-of-origin, so as to

be able to sell those fitting at higher prices typically paid for U.S.-made fittings;

and (2) to conceal this failure to mark from Customs so as to avoid paying

"marking duties" due under the Tariff Act, 19 U.S.C. § 1304(i).  The Complaint

alleged that by successfully pursuing the second of these goals—the evasion of

marking duties—Victaulic violated the "reverse false claims" provision of the

FCA, 31 U.S.C. § 3729(a)(1)(G).

On October 10, 2013, Victaulic moved to dismiss for lack of jurisdiction

under Fed. R. Civ. P. 12(b)(1) based on the "public disclosure bar," 31 U.S.C.

§ 3730(e)(4), or, in the alternative, for failure to state a claim under Fed. R. Civ. P.

12(b)(6). In response to Victaulic's public disclosure argument, CFI submitted a declaration of its President, Rebecca L. Woodings ("CFI Declaration," JA 382-91) explaining the complex, data-driven investigation CFI conducted that established Victaulic's violations. CFI submitted that declaration to demonstrate that the information it relied upon had not been "publicly disclosed" within the meaning of the FCA. JA 194-95. The Coalition for a Prosperous America, National Association of Consumer Advocates, and Southeastern Fisheries Association also filed an *amicus* brief below supporting an interpretation of the FCA that covers the evasion of marking duties. *See* Dist. Dkt. 27.

The district court rejected Victaulic's "public disclosure" argument, JA 24-35, but ruled that CFI's Complaint failed to state a claim. The court reasoned that CFI's analysis, as set forth in the CFI Declaration—which the court considered even though it was not part of the original Complaint—was "merely consistent with" Victaulic deliberately failing to mark its imported pipe fittings, and thus did not satisfy the "plausibility" standard under Fed. R. Civ. P. 8(a). FCA. JA 45-47. The court dismissed with prejudice.

On October 2, 2014, CFI moved to alter or amend that dismissal order and for leave to file an amended complaint. CFI's proposed FAC addressed the district court's stated concerns with CFI's investigation primarily by including an expert statistical analysis by Abraham J. Wyner, Ph.D., a Professor of Statistics at the

4

University of Pennsylvania.  Dr. Wyner demonstrated, in a sworn declaration incorporated into the FAC, that CFI's investigation established with "99.9% confidence" that "Victaulic is improperly marking a significant portion of its imports" and that even drawing every inference in Victaulic's favor, "CFI's findings are so stark that the only conclusion one can possibly reach is that Victaulic is not properly marking its imports."  JA 304-05, 317, 360, 361-63.  The district court denied CFI's motion, ruling that CFI had "unduly delayed" its request for leave to amend, and that the filing of the FAC would be "futile" because it failed to state a violation of the FCA, and was not adequately "particular" under Fed. R. Civ. P. 9(b).  JA 69-101.  This appeal followed.

## II.    Facts Relevant To Issues On Review

In the FAC, CFI alleged the following facts, which must be accepted as true for purposes of this appeal.  *Foglia*, 754 F.3d at 154 n.1.  The majority of these facts were also before the district court at the time of its original dismissal because they were alleged in the Complaint or included in the CFI Declaration.

CFI's principals "are experienced in the pipe and tube industry, and are also international trade experts.  They have represented U.S. companies and industries in international trade matters before administrative agencies, courts, international tribunals, and Congress, as well as provided direct support to senior officials at the

U.S. International Trade Commission ("ITC") and U.S. Department of Commerce." JA 302-03, 306, 308-09, 382-83.

The FAC alleged that although "[o]riginally, Victaulic made all of its products in the United States," "over the past decade, the company has moved much of its operations overseas, opening plants in China, Poland, and Mexico." JA 110, 114-15, 313. The drastic "reduction of Victaulic's U.S. manufacturing operations" was accompanied by "large lay-offs of American workers." JA 110, 114-15, 313-15. Other "available evidence points to Victaulic focusing its research and development efforts in the U.S., while maintaining the bulk of its manufacturing operations abroad," suggesting that Victaulic no longer makes standard pipe fittings in the U.S. JA 313-15. Yet, CFI was aware that "Victaulic . . . was selling pipe fittings with no country-of-origin markings." JA 303. Because U.S. law requires that imported pipe fittings be marked with country-of-origin, 19 U.S.C. § 1304(a), unmarked fittings are understood in the pipe industry to be U.S.-made. JA 303, 323-24.

CFI thus "initiated an inquiry into importation and sales activities by Victaulic to determine whether Victaulic was, in fact, systematically failing to mark its imported pipe fittings with foreign country-of-origin information." JA 303, 383-84. CFI's purpose "was to objectively test whether CFI's own observations and other empirical evidence of which CFI was aware were, in fact,

true reflections of fraud being committed by Victaulic, or were mere anomalies that could be explained by some other factor not indicative of fraud." JA 303. Ultimately, CFI identified a "disparity between (a) the flood of imported Victaulic pipe fittings and (b) the almost complete absence of foreign country-of-origin markings" that could only be explained by Victaulic intentionally failing to mark its foreign imports. JA 304, 323, 385.

CFI identified this disparity through "a comparison of two sets of data" obtained from the results of CFI's (1) "import analysis" and (2) "product study." JA 303-04, 308-13, 316-24, 384-96. This comparison demonstrated, in essence, that while (1) Victaulic was importing a massive quantity of foreign-made fittings, comprising a majority of Victaulic's U.S. sales, (2) only a *de minimis* percentage of Victaulic fittings showed foreign country-of-origin marks, and a majority of those fittings had no country-of-origin marks at all. CFI thus concluded that Victaulic must be importing unmarked fittings.

More specifically, CFI's "import analysis" revealed that, in recent years, a significant majority of Victaulic's U.S. pipe fitting sales were comprised of foreign imports. JA at 303, 308-13, 384-91. CFI's import analysis involved two steps. First, CFI used its "sophisticated knowledge of automated ship manifest data" and "understanding of the U.S. tariff code classification system" to search and analyze raw customs import data. JA 119-89, 308-310, 384-89. This data showed that

7

"[s]ince 2003, Victaulic has imported by ship approximately 83 million pounds of fittings from China and Poland for sale in the U.S., with additional imports arriving from Mexico by land." JA 115, 119-89, 308, 310, 341-51. Both CFI's original Complaint and FAC included lengthy spreadsheets taken from ship manifest data documenting these imports arriving by sea (including date, country of origin, port of import, weight, and importer of record). JA 115, 119-89, 341-51.

Second, to "estimat[e] what percentage these imports comprised of Victaulic's annual U.S. sales," CFI conducted a "retail price cross-check." JA 310-13, 389. CFI first estimated the retail value of these imports to be between $10 and $15 per pound. JA 310-13, 391. CFI arrived at this figure by compiling 147 separate price observations for 49 different products with three sizes each using Victaulic's 2011 price list, resulting in an average list price per pound of $36.40, which CFI then reduced using a discount range typical in the piping industry. JA 310-12; 389-90. Given information indicating Victaulic annual sales of $250-$280 million, CFI was then able to estimate what percentage of Victaulic's U.S. sales were of foreign-made pipe fittings, concluding that they accounted for "a significant majority of its annual U.S. sales." JA 111, 115, 310-13, 390-91.

Comparative data was then derived from CFI's "product study," a survey of the secondary market for Victaulic pipe fittings, which revealed that, contrary to the expectation flowing from the "import analysis," "less than 2 percent of

8

Victaulic pipe fittings contained any foreign country-of-origin marking, with only a single pipe fitting properly marked with its country of origin in compliance with U.S. law." JA 304, *see also* JA 316-24, 384-85, 391-96. CFI's product study consisted of identifying and analyzing Victaulic pipe fittings for sale on eBay over a period of almost six months to determine whether the products had been marked with a country of origin. JA 317-21, 393-95. For products whose accompanying photographs were limited or unclear as to whether a country-of-origin marking was present, CFI further selected a number of samples for purchase and physical inspection. JA 322, 394.

A table summarizing the products and/or eBay listings reviewed by CFI, 221 in total, was included with the CFI Declaration and the FAC. JA 320-21, 364-75, 394-95. Of this total, "[o]nly 3 listings (1.36%) showed any foreign country-of-origin marking," with "almost all of Victaulic's pipe fittings . . . marked as made in the U.S.A or, much more frequently, bear[ing] no country-of-origin markings whatsoever." JA 115, 321. CFI's physical examination confirmed these findings. JA 322, 395-96. CFI thus concluded that Victaulic was systematically failing to properly mark its foreign pipe fittings. JA 115, 303, 324.

Dr. Wyner reviewed CFI's analysis and concluded that the mere comparison of the two key facts alone—that almost all of Victaulic's fittings are foreign-made, but almost none bear foreign country-of-origin markings—provides

9

"overwhelming evidence" that Victaulic is "failing to mark its imported pipe fittings as required by U.S. law," a conclusion that can be reached with 99.9% certainty based on CFI's findings even drawing "every inference in Victaulic's favor." JA 304-05, 317.

As alleged in the FAC, "[w]hen a foreign country-of-origin marking is not present on a pipe fitting, end-users in the pipe industry will assume that the product was made in America. Thus, the fact that a substantial majority of Victaulic's pipe fittings are unmarked (with a much smaller percent marked made in the U.S.A.) strongly suggests that Victaulic is engaging in an intentional practice of leaving its foreign-made pipe fittings unmarked to deceive the piping industry into believing that the preponderance of its pipe fitting sales in the U.S. are American made." JA 323-24.

The above factual allegations are alone sufficient to support CFI's claim that Victaulic has knowingly evaded the payment of duties. JA 115, 327-330. Improperly marked foreign goods are subject to "marking duties," which are assessed at "10 per centum ad valorem," are "deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." 19 U.S.C. § 1304(i); *see also* JA 113, 305, 327. Importers have a duty to disclose marking violations and/or deposit estimated marking duties at the time of importation. *See*

10

Argument Section I.D; *see also* JA 114, 327-29.  When Customs is informed of a

marking violation prior to imports being released into the U.S. stream of

commerce, it will require proper marking, destruction, or re-export of the goods

under Customs' supervision.  19 U.S.C. § 1304(i), 19 C.F.R. § 134.51(a); *see also*

JA 113-14, 327, 329.  If this occurs prior to liquidation, marking duties will not

accrue.  19 U.S.C. § 1304(i).

Thus, if Victaulic complied with the marking law, one would *never* see its

foreign pipe fittings for sale in the U.S. without a proper country-of-origin mark.[1]

Accordingly, the mere presence in the U.S. stream of commerce of unmarked

foreign fittings at the levels identified by CFI demonstrates that Victaulic failed to

disclose its marking violations to Customs.  JA 113-15, 329-30.  As alleged in the

FAC, Victaulic is only able to import unmarked pipe fittings and evade marking

duties "by, among other things, falsifying its entry documents and otherwise

concealing the foreign source of its pipe fittings such that CBP will not detect the

company's fraud."  JA 330; *see also* JA 115.

_____

[1]    The only theoretical exception might be if Victaulic had innocently imported
unmarked fittings, and only learned of the lack of marking after it sold the fittings
into the stream of commerce.  But, here, Victaulic is both the manufacturer and the
importer.  JA 110, 114-16, 306-08, 313-15.  Accordingly, that theoretical exception
would not apply because, as the manufacturer of the fittings, Victaulic itself made
the decision whether to mark.

Both CFI's Complaint and FAC alleged that Victaulic has been importing unmarked fittings since at least 2003 and identified specific imports from China and Poland from 2003 through January 9, 2013. By weight, 77% of those imports occurred after May 20, 2009, the effective date of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4(f), 123 Stat 1617, 1625 (May 20, 2009). Because that only takes into account imports through January 9, 2013, and Victaulic's conduct likely continued after that date, an even higher percentage of the imports at issue in this case were post-FERA. Accordingly, to simplify this appeal, CFI will focus only on the post-FERA imports.

## SUMMARY OF ARGUMENT

1.    The district court erred in holding that CFI failed to state a claim for violation of the reverse-false-claims provision. FERA added a broad definition of "obligation" that includes "an established duty, whether or not fixed, arising . . . from statute or regulation." 31 U.S.C. § 3729(b)(3). The Tariff Act makes clear that marking duties fall squarely within that definition of "obligation." FERA's legislative history further demonstrates a Congressional intent to specifically *include* marking duties within the scope of the FCA and to overrule an earlier Sixth Circuit holding that marking duties were not covered. While recognizing and accepting that legislative intent, the district court nevertheless adopted and then applied a strained reading of the phrase "knowingly conceals or knowingly and

12

improperly avoids or decreases an obligation to pay or transmit money or property

to the Government," 31 U.S.C. § 3729(a)(1)(G), that both misinterpreted how

marking duties work and that cannot be reconciled with the legislative intent to

make marking duties actionable under the FCA.  Finally, the district court's

conclusion that importers who know their goods are not properly marked have no

duty to disclose this to Customs ignores the plain language and purpose of the

customs statutes and regulations and, if allowed to stand, would create a dangerous

incentive for importers to hide marking violations.

　　　2.　　The district court's ruling that the FAC failed to satisfy the

"particularity" standard of Fed. R. Civ. P. 9(b) is directly contrary to this Court's

decision in *Foglia*, 754 F.3d 153.  The FAC not only provided notice to Victaulic

of the claims against it, but also alleged the facts in support of those claims in great

(and more than sufficient) detail.

　　　3.　　The district court's denial of CFI's motion for leave to file the FAC

on grounds of undue delay was an abuse of discretion.  CFI sought leave to amend

for the first time immediately after the district court dismissed the original

Complaint with prejudice on grounds that it did not allege sufficient facts under the

"plausibility" standard of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007),

and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and before any discovery had been

conducted.  Victaulic neither argued nor demonstrated that it would suffer

13

prejudice.  Yet, the district court adopted a rule that a plaintiff "unduly delays"—and thus somehow prejudices *the court*—whenever the plaintiff fails to seek leave to amend after the filing of a motion to dismiss, but before the court has ruled on that motion.  This Court has never adopted such a drastic rule, which runs contrary to Fed. R. Civ. P. 15(a)'s requirement that leave to amend "shall be freely given when justice so requires."

4.    In dismissing the original Complaint, the district court improperly substituted its own opinions about the inferences to be drawn from CFI's detailed investigation, and treated the *Twombly*/*Iqbal* "plausibility" standard as giving it license to decide not only whether CFI had alleged marking violations by Victaulic, but also whether CFI could *prove* those allegations and *disprove* even the most speculative "innocent" explanation for the evidence CFI amassed against Victaulic.  By requiring CFI to present evidence more convincing at the pleading stage than would even be required at trial, the district court misapplied the "plausibility" standard.

## STANDARD OF REVIEW

All issues presented in this appeal are subject to *de novo* review except for the district court's ruling on undue delay, which is reviewed for abuse of discretion.  Generally, motions to alter judgment and for leave to amend are reviewed for abuse of discretion, but matters of law are subject to plenary review.

*Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). The proper interpretation of the FCA is a question of law subject to plenary review. *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 232 (3d Cir. 1998). Similarly, a "futility" finding based on an erroneous view of the legal sufficiency of an amendment constitutes an abuse of discretion and thus is also reviewed *de novo*, as is the dismissal of a complaint for failure to state a claim. *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014); *Foglia*, 754 F.3d at 154 n.1; *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 243 (3d Cir. 2010).

## ARGUMENT

### I. The District Court Erred In Holding That CFI Failed To Allege A Violation Of The False Claims Act

The district court denied leave to amend as futile, holding that "Victaulic's alleged failure to pay marking duties does not give rise to a claim under the FCA." JA 83. This is the threshold legal issue in the case; accordingly, CFI addresses this holding first.

#### A. The Plain Language Of The FCA And Tariff Act Show That Evasion Of Marking Duties Is Actionable Under The FCA

Statutory interpretation "begin[s] 'with an examination of the plain language of the statute.'" *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir.

2001)).  "When the statute's language is plain, the court's obligation is to enforce the statute according to its terms, at least where the disposition is not absurd (or where a literal application of a statute would not produce a result demonstrably at odds with the intentions of its drafters)." *Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 200 (3d Cir. 2015).  Under a plain language reading of the relevant statutory language, marking duties unquestionably are recoverable under the FCA's reverse-false-claims provision.  This provision, as amended in 2009 by FERA, imposes liability on any person who (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  FERA defines "obligation" as "an established duty, whether or not fixed, arising . . . from statute or regulation."  31 U.S.C. § 3729(b)(3).

Whether marking duties fall within this definition is resolved by the Tariff Act's plain language.  The duty to pay marking duties is one "arising . . . from statute," namely, the Tariff Act, 19 U.S.C. § 1304(i), which provides that imports not properly marked with their country of origin are subject to "[a]dditional duties for failure to mark" in the amount of "10 per centum ad valorem," which "shall not

16

be construed as penal."[2] That marking duties are "an established duty, whether or not fixed" is also expressly answered by the plain language of the Tariff Act, which provides that marking duties "shall be deemed to have accrued at the time of importation . . . and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." 19 U.S.C. § 1304(i).

Thus, marking duties fall literally, indeed squarely, within the plain language of the FCA that defines "obligation." And reaching that conclusion "would not produce a result demonstrably at odds with the intentions of its drafters." *Bonkowski*, 787 F.3d at 200. Accordingly, this simple and obvious reading of the two relevant statutes compels the conclusion that the district court erred in holding that marking duties are not actionable under the FCA.

In the court below, Victaulic argued that marking duties are "penalties," and thus fall outside the scope of the FCA, an issue the district court chose not to address. JA 88 n.10. While it is true that some pre-FERA cases held that

---

[2]      The Tariff Act provides that all imported goods must be "marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a). In 1984, Congress added a specific, stringent rule prohibiting any exception to this marking requirement for imported steel pipe and pipe fittings, such as those at issue here, 19 U.S.C. § 1304(c), in recognition that "[t]here appears to have been significant evasion of the law with regard to these articles," S. Rep. 98-308, at 32 (1983), *reprinted in* 1984 U.S.C.C.A.N. 4910, 4941.

"penalties" were not recoverable under the FCA, and while (as will be discussed

below) the drafters of FERA intended to retain that rule, it is one that does not aid

Victaulic. Marking duties are not "penalties." The Tariff Act itself says that

marking duties "shall not be construed to be penal, and shall not be remitted

wholly or in part nor shall payment thereof be avoidable for any cause." 19 U.S.C.

§ 1304(i); *see also Cotonificio Bustese, S.A. v. Morgenthau*, 121 F.2d 884, 888

(D.C. Cir. 1941) (1938 amendments to Tariff Act adding this language made clear

that marking duties are not penalties). And this makes sense, since the Tariff Act

has no scienter requirement for marking duties, which accrue even if an importer

innocently introduces unmarked goods into the stream of commerce. In contrast,

Customs has separate statutory authority to impose penalties for failing to pay

marking duties when that failure is accompanied by some degree of scienter. *See*

19 U.S.C. § 1592(a). Accordingly, should Victaulic again argue that marking

duties are "penalties" outside the scope of the FCA, such argument should be

rejected.

      **B.**    **The Above Plain Language Reading Is Consistent With Congressional Intent To Make Knowing Failure To Pay Marking Duties Actionable Under The FCA And To Overrule The Marking Duties Holding Of *ATMI***

"[I]n the face of statutory ambiguity or uncertainty, [the Court] may 'have

recourse to the legislative history of the measure and the statements by those in

charge of it during its consideration by the Congress.'" *Estate of Arrington v.*

*Michael*, 738 F.3d 599, 605 (3d Cir. 2013) (quoting *United States v. Great N. Ry.*, 287 U.S. 144, 154–55 (1932)).  But the Court does "'not resort to legislative history to cloud a statutory text that is clear.'"  *Id.* (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)).  Here, as just discussed, the statutory text is clear; therefore, the Court need go no further.  But even if the statutory language had left ambiguity, relevant legislative history shows that Congress intended the reverse-false-claim provision to cover marking duties.

FERA amended the reverse-false-claims provision in two respects.  First, the provision was expanded to no longer require a false statement to trigger liability and, where a false statement is made, to only require that it be "material" to an obligation to pay or transmit money or property to the Government.  *Compare* 31 U.S.C. § 3729(a)(1)(G) (present version) *with* JA 638 (prior version, 31 U.S.C. § 3729(a)(7)).  Second, FERA defined "obligation" broadly, as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

The legislative history of this new definition of "obligation" demonstrates legislative intent to include marking duties.  An earlier draft, in fact, expressly included "customs duties for mismarking country of origin" within the definition

of "obligation."[3]  JA 658 (S. Rep. No. 110-507 (2008)) ("The new definition of the term 'obligation' also includes 'customs duties for mismarking country of origin.'").  "After subsequent discussion with the Department of Justice," however, "the Committee decided to remove the 'customs duties' language," explaining that it "believ[ed] that customs duties clearly fall within the new definition of the term 'obligation' absent an express reference and any such specific language would be unnecessary."  JA 707 (S. Rep. No. 111-10, at n.10 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430).  Because the *only* customs duties imposed "for mismarking country of origin" are marking duties under 19 U.S.C. § 1304(i), the Senate Committee evidently intended to include marking duties within the scope of the FCA.

This understanding is confirmed by the fact that the new definition of "obligation" was intended, among other things, to overrule the "marking duties" holding of *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc. ("ATMI")*, 190 F.3d 729 (6th Cir. 1999).  As the Senate Judiciary Committee report accompanying

---

[3]    This earlier draft defined "obligation" as "a fixed duty, or a contingent duty arising from an express or implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship, *including customs duties for mismarking country of origin*, and the retention of any overpayment."  JA 674 (S. Rep. No. 110-507 (emphasis added)).

FERA stated, Congress intended to overrule *ATMI*, which had too "narrowly defined the term 'obligation' to apply reverse false claims to only fixed obligations" and had thus incorrectly "dismiss[ed] a claim for false statements made by importers to avoid paying customs duties."  JA 658 (S. Rep. No. 110-507); *see also* 707 (S. Rep. No. 111-10 at n.10).

The Committee's reference to *ATMI*'s dismissal of a claim for "false statements made by importers to avoid paying customs duties" was, again, directed specifically to marking duties.  *Id*.  ATMI primarily involved two categories of FCA claims: (1) for alleged evasion of statutory penalties and (2) for alleged failure to pay marking duties.  190 F.3d at 731-32.  The majority of the opinion dealt with the question of whether penalties under 19 U.S.C. § 1592 (and other similar penalty statutes upon which the relator had relied) were "contingent obligations" that "arise only after the exercise of discretion by government actors" and thus were not within the scope of the then-existing reverse-false-claims provision.  *ATMI*, 190 F.3d at 738-41.  *ATMI*'s holding that such penalties were outside the scope of the FCA was consistent with the majority approach in pre-

FERA case law that fines or penalties contingent upon the exercise of prosecutorial discretion were not actionable obligations under the FCA.[4]

*ATMI* then dealt separately with marking duties—which the Sixth Circuit viewed as "present[ing] the most difficulty"—but, like the district court here, held that these *also* could not be recovered under the FCA. *Id*. at 741-42.

FERA's legislative history suggests that Congress *agreed* with the case law holding that the FCA should *not* be used to enforce fines or penalties subject to prosecutorial discretion "before the duty to pay that fine has been formally established." *See, e.g.*, 155 Cong. Rec. S4539, 2009 WL 1077017 (daily ed. April 22, 2009) (statement of Sen. Kyle). In a floor amendment introduced by Sen. Kyle, the word "contingent" was removed from the final definition of "obligation," and Sen. Kyle explained that this was done to make clear that discretionary "duties to pay penalties or fines" did not fall within its ambit. *Id*. But because, as discussed above, marking duties are not penalties, Sen. Kyle's amendment was consistent with the Committee's stated intent to overrule the part of *ATMI* holding that marking duties were not recoverable under the FCA. 190 F.3d at 731-32; *see*

---

[4]      *See, e.g. United States ex rel. Bahrani v. ConAgra, Inc.*, 465 F.3d 1189, 1195-96, 1199-200, 1203-04 (10th Cir. 2006); *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657–58 (5th Cir. 2004) ; *United States v. Quick Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997); *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prod., Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005).

*also Huangyan*, 370 F. Supp. 2d at 1001 (distinguishing marking duties from the other punitive and plainly contingent obligations at issue in *ATMI*).  This conclusion is reinforced by the Senate Committee's description of "customs duties for mismarking country of origin" as a "singular type of obligation that is specific and not a general class of obligations," such as fines and penalties.  JA 658, 707 n.10.

Accordingly, the plain language interpretation of the FCA and Tariff Act discussed above in Section I.A is consistent with Congressional intent to include marking duties within the scope of the FCA and to overrule that portion of *ATMI* that held otherwise.  The court below recognized this, stating that "[i]t is apparent from the legislative history that Congress considered 'customs duties for mismarking country of origin' to be encompassed within the new definition [of 'obligation']."  JA 88 n.10.  The court, however, failed to give effect to the very Congressional purpose it recognized because, in a strained and unnecessary interpretation of other language that Congress put in the same sentence with the word "obligation," the court concluded that marking duties could *not* be a covered. It is to this issue that we turn next.

**C.    The District Court Incorrectly Reasoned That The Words "Conceal, "Avoid" Or "Decrease" Take Marking Duties Outside The Scope Of The FCA.**

In its key legal ruling, the district court held that "[w]hen a course of conduct is necessary to create an obligation to pay the Government, that same course of conduct cannot also be said to 'conceal,' 'avoid,' or 'decrease' the obligation within the ordinary meaning of those words, even if the conduct giving rise to the obligation is fraudulent."  JA 86.  It derived this interpretation of 31 U.S.C. § 3729(a)(1)(G) from two sources.  It looked to definitions drawn from an online dictionary to derive a supposed "ordinary meaning."  And it relied upon the Sixth Circuit's reasoning in *ATMI*.  JA 84-86.  But neither source, in fact, supports the court's interpretation, at least as applied to marking duties.

First, the district court's "ordinary meaning" interpretation is hardly an obvious, and certainly not the most reasonable, reading of the statutory text.  But even if it was, the district court misapplied even that interpretation.  The conduct that gives rise to liability for marking duties is *not* the same conduct that qualifies as "concealing," "avoiding" or "decreasing."  Rather, under 19 U.S.C. § 1304(i), marking duties become due when goods are imported that are not properly marked with their country of origin and enter the stream of commerce.  Marking duties are due under the Tariff Act even if an importer acts entirely innocently during the

24

importation process, and only learns of the marking violation after the goods have already entered the stream of commerce.

In contrast, liability under the FCA does not arise from innocent mistakes. Rather, a defendant is liable under the FCA only if it "knowingly" conceals, avoids or decreases an obligation to pay money to the Government. 31 U.S.C. § 3729(a)(1)(G). Here, CFI alleged that Victaulic knowingly misled Customs by concealing its intentional failure to mark its pipe fittings (despite a duty to disclose that the fittings were unmarked, an issue addressed below). That knowing failure to disclose, and subsequent failure to pay marking duties that Victaulic knew were owed, which triggers liability under the FCA, is additional conduct that constitutes "concealing" or "avoiding" separate and apart from whether Victaulic owes marking duties under 19 U.S.C. § 1304(i).

Thus, the district court's conclusion that the "same course of conduct" gave rise to both the "obligation" to pay marking duties and also constituted concealing/avoiding/decreasing under the FCA was wrong. The conduct that gave rise to the duties was importation and entry into the stream of commerce; the conduct that gave rise to FCA liability was concealing the failure to mark and later deciding not to pay (thus avoiding) marking duties.

Second, and more fundamentally, the district court's interpretation of the concealing/avoiding/decreasing provision of 31 U.S.C. § 3729(a)(1)(G)—driven

25

by the court's reliance on *ATMI*, which it found to be "particularly relevant" to the issue, JA 84—was directly inconsistent with the legislative intent to make marking duties actionable under the FCA and to overrule *ATMI*'s marking duties holding. Under the district court's "same course of conduct" theory, even though Congress intended marking duties to be actionable under the FCA (a legislative intent the court itself recognized and accepted), Congress simultaneously made it essentially impossible to successfully assert such a claim.

The district court thereby reached precisely the type of "absurd result" that this Court seeks to avoid when "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Fontaine,* 697 F.3d 221, 227 (3d Cir. 2012) (internal citations and quotation marks omitted); *see also Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014). Here, as shown above, the district court's asserted "ordinary meaning" application of the concealing/avoiding/decreasing provision was not actually a "literal application." But even if it was, it would have to give way to the intention of FERA's drafters to make marking duties actionable under the FCA.[5]

---

[5]    Though not explicitly relying upon it, the district court also quoted a passage of *ATMI* stating that "a plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement." JA 84 (quoting 190 F.3d at 734). Prior to FERA, this reasoning was

[Footnote continued on next page]

### D.     Contrary To The District Court's Conclusion, Importers Have A Duty To Disclose Marking Violations

The district court erroneously ruled that an importer who knowingly imports unmarked goods is not required to disclose marking violations to, or deposit estimated marking duties with, Customs "before any marking duties had in fact accrued."  JA 81-82, 87.  This Court need not reach that issue, because a "duty to disclose" is not a necessary prerequisite to "concealing" or "avoiding" within the meaning of the reverse-false-claims provision.  At a minimum, if Victaulic owed marking duties to the Government after its unmarked fittings entered the stream of commerce and made a knowing decision to not pay, then Victaulic "avoided" an obligation within the meaning of the FCA.

But should this Court reach the issue, it should conclude that the district court was wrong.  Indeed, the district court's ruling ignores the plain language and purpose of the customs statutes and regulations and, if allowed to stand, would

---

[Footnote continued from previous page]

controversial.  *See, e.g.*, *Huangyan*, 370 F. Supp. 2d at 999-1002.  Post-FERA, such a rule would be obviously inconsistent with the language of 31 U.S.C. § 3729(a)(1)(G) and the definition of "obligation," neither of which include or imply any particular temporal connection between the attachment of the "obligation" and the act or omission giving rise to FCA liability.  And, as applied to marking duties, such a rule would be contrary to the specific legislative intent to make marking duties actionable under the FCA.

create a dangerous incentive for importers to hide violations of country-of-origin marking requirements.

Although a good faith importer may ultimately be able to avoid liability for marking duties by re-exporting, destroying, or properly marking its merchandise prior to liquidation, an importer unquestionably has an obligation, at the time of importation, to inform Customs that the goods are not marked and to pay estimated marking duties.  First and foremost, that is because, by statute, any exportation, destruction, or marking of improperly marked goods must "be accomplished under customs supervision," 19 U.S.C. § 1304(i), and Customs can only exercise such "supervision" if Customs is alerted to a marking problem.  The district court's ruling to the contrary defeats the purpose of the marking statutory scheme by encouraging bad faith importers (like Victaulic is alleged to be here) to withhold information from Customs regarding marking violations.

It also is in direct conflict with the "informed compliance" regulatory regime implemented by the 1993 North American Free Trade Implementation Act (Customs Modernization Act), Pub. L. No. 103-82, 107 Stat. 2057 (1993) ("Mod Act").  The Mod Act adopted a "reasonable care" standard, 19 U.S.C. § 1484, that requires importers to share responsibility with Customs for ensuring compliance with customs laws and regulations.  *See* William J. Kovatch, Jr., *The Duty of "Reasonable Care" Under the Customs Modernization Act of 1993*, 28 DENV. J.

INT'L L. & POL'Y 73 (1999); Timothy G. Moran, *Customs A' La Mode*, VT. B.J. &

L. DIG. (1997).  As the district court acknowledged, pursuant to 19 U.S.C. § 1484,

to "clear [] merchandise through CBP, an importer must 'make entry' upon or

shortly after importation by filing entry documentation with CBP."  JA 75-76.

Such documentation must, *inter alia*, provide information sufficient to (a) show

that imports comply with any "applicable requirement of law" such that they "may

be released" from Customs custody and (b) enable Customs to "properly assess

duties on the merchandise."  19 U.S.C. § 1484(a), 19 C.F.R. § 141.0(a-b).

All foreign imports must be marked with their country of origin.  19 U.S.C.

§ 1304(a, c); 19 C.F.R. § 134.3(a).  And no article in CBP's custody may be

delivered unless it is properly marked or estimated marking duties are deposited.

19 U.S.C § 1304(j).  Consequently, through the provision of entry documentation

under 19 U.S.C. § 1484, importers certify to Customs that their goods are properly

marked and thus entitled to be admitted into U.S. commerce, or they must alert

Customs to the contrary.

Indeed, the reasonable care standard of 19 U.S.C. § 1484 was intended to

line up with the requirements of 19 U.S.C. § 1592, which imposes a duty on

importers to disclose material information.  Brief by U.S. in *United States v. Trek

Leather, Inc.*, No. 2011-1527, 2014 WL 2738331, at *20 (Fed. Cir. June 2, 2014)

("[O]ne of the purposes of the Mod Act was to modify 19 U.S.C. § 1484(a) and

bring the responsibilities of the importing community in line with regulations requiring the exercise of reasonable care under 19 U.S.C. § 1592.").  Under 19 U.S.C. § 1592, no person "may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or (ii) any omission which is material."

Customs regulations expressly state that false representations or omissions with respect to country-of-origin marking and marking duties are material.  19 C.F.R. § Pt. 171, App. B ("A document, statement, act, or omission is material if it has the natural tendency to influence or is capable of influencing agency action including, but not limited to a Customs action regarding: (1) Determination of the classification, appraisement, or *admissibility* of merchandise . . . ; (2) determination of an importer's liability for duty (including *marking*, antidumping, and/or countervailing duty) . . . .") (emphasis added).  Thus, if goods are not properly marked, an importer has a duty to disclose this at the time of importation, whether by, for example, alerting Customs to this fact via Form 7501 or by filing a

bonded entry via Form 7512 such that the unmarked goods are not released from Customs' custody and into the stream of commerce.[6]

Customs rulings further demonstrate that importers have an obligation to work with Customs to ensure proper marking of goods and thus must disclose to Customs when imports arrive unmarked. Unmarked goods must be marked, exported or destroyed "under customs supervision," 19 U.S.C. § 1304(i), either before delivery, or, if an importer takes immediate delivery under bond (as usually

---

[6]    Generally, an importer files "an entry summary for consumption" via Form 7501 when "goods are to be released from CBP custody at the time of entry," in other words, distributed into the stream of commerce. *See* U.S. Customs and Border Protection, Pub. 0000-0504, Importing into the United States: A Guide for Commercial Importers 12-13 (2006) ("Customs Pub. 0000-0504"), *available at* http://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf. Form 7501 requires importers to record "any other fee, charge or exaction that applies," JA 621, any "estimated duty . . . and any other fees or charges," JA 625, and the "total estimated AD/CVD or other fees, charges or exactions paid" JA 627.

If the release of goods needs to be postponed to mark or re-export the goods, an importer may place them "in a CBP bonded warehouse under a warehouse entry," after which they "may be exported without the payment of duty, or they may be withdrawn for consumption." Customs Pub. 0000-0504 at 14. Form 7512 is typically used when goods are prohibited by U.S. law and thus must be re-exported, but warehouse entries may also be accomplished via the filing of Form 7501 using entry code 21 or 22. *See* 19 C.F.R. § 18.25 & 144.37; U.S. Customs and Border Protection, Pub. HB 3500-11, Bonded Warehouse Manual for Customs and Border Protection Officers and Bonded Warehouse Proprietors 41, 52 (2012), *available at* http://www.cbp.gov/sites/default/files/documents/bonded_warehouse.pdf.

occurs), upon actual or constructive redelivery to Customs' custody. Even if unmarked goods are exported or properly marked prior to liquidation, marking duties will accrue if such exportation or marking does not occur "under customs supervision." 19 U.S.C. § 1304(i); *see also, e.g.*, *Frontier Ins. Co. v. United States*, 185 F. Supp. 2d 1375, 1379 (Ct. Int'l Trade 2002); Customs Ruling, HQ H077355, 2009 WL 5488688 (Oct. 28, 2009); Customs Ruling, HQ 735472, 1994 WL 896594, at *3 (July 8, 1994) ("Remarking of merchandise alone is not sufficient to cancel an assessment of marking duties; it must be done under Customs supervision.").

Customs has discretion to require goods to be marked under its physical supervision at a bonded warehouse or Foreign Trade Zone or to conditionally release the merchandise for marking at a location of the importer's choosing, in which case the importer must provide a certificate of marking and receive notification from Customs that the marking is acceptable.[7] *See Frontier*, 185 F. Supp. 2d at 1379; Customs Ruling, HQ 734282, 1992 WL 313523 (Feb. 10, 1992)

---

[7] This certification process is initiated via issuance by Customs of a Notice to Mark (CBP Form 4647), informing the importer that "all merchandise must be retained until you are notified by Customs that corrective action is acceptable," with the form instructions warning that merchandise "cannot be moved or distributed until authorized by the Customs Service." *Frontier*, 185 F. Supp. 2d at 1379-80; *see also* 19 C.F.R. § 134.51, 134.52.

(citing 19 C.F.R. § 134.51, 134.52); *see also* Customs Ruling, HQ 734291, 26 Cust. B. & Dec. 406, 1991 WL 537178 (Aug. 26, 1991); Customs Ruling, HQ 733856, 25 Cust. B. & Dec. 307, 1991 WL 544155 (Mar. 8, 1991).  However Customs chooses to proceed, when goods arrive in U.S. customs territory unmarked, an importer unquestionably must obtain Customs' authorization to correct the problem and enter the corrected goods into the stream of commerce. *See Frontier*, 185 F. Supp. 2d at 1380 (affirming the assessment of marking duties notwithstanding certification of marking by importer because importer had "failed to obtain authorization from Customs to release the merchandise into the commerce of the United States"); Customs Ruling, HQ 967982, 2006 WL 1555426, at *3 (Feb. 7, 2006).

Marking duties thus accrue unless Customs is notified of unmarked goods before they are distributed into the stream of commerce.  Importers are not permitted to "self-regulate."  *Frontier*, 185 F. Supp. 2d at 1380.  Rather, the marking duty statute requires importers to alert Customs when goods arrive unmarked so that Customs can work with importers to ensure compliance. Customs' ability to enforce the marking duty statute critically depends on the importer's duty to disclose known marking violations at the time of importation. Customs' regulatory practice, moreover, is designed to incentivize importers "to bring in legally marked merchandise at the time of importation."  HQ 734282,

33

1992 WL 313523, at *2.  Customs has no practical ability to monitor or achieve this fundamental goal of the marking statute if importers have no duty to disclose known marking problems.

Finally, the district court's holding cannot be squared with the requirement that an importer deposit "the amount of duties and fees estimated to be payable" at the time goods are entered for U.S. consumption.  19 U.S.C. § 1505(a); 19 C.F.R. § 141.101 & 141.103; *see also* JA 76.  The amount of duties deposited represents the importer's estimate of what it owes, but because entries often automatically "liquidate" by statute at the duty rate estimated by the importer, any false information or omissions in entry documents will directly cause marking duties not to be paid.  *See* 19 U.S.C. § 1504(a); 19 C.F.R. § 159.11.  Under the district court's reasoning, however, an importer has no duty to estimate marking duties at anything but zero at the time of importation even if the importer knows its goods are not properly marked and has no intention of correcting the error.  This Court should not affirm such a logical fallacy that sanctions duty evasion.

Indeed, recognition of an importer's duty to disclose is necessary because "CBP physically inspects only a tiny fraction of shipments arriving in the United States (approximately 1-2%), and the inspections that CBP does conduct necessarily tend to focus primarily on security and law enforcement matters rather

than tariff requirements." JA 329.[8] "Shipments by a major manufacturer may almost never be subject to a physical inspection, and even if they are, only a tiny portion of the contents of a sealed shipping container would likely be examined." JA 329. Customs is thus highly unlikely to catch marking omissions on its own.

In sum, importers' "duty to disclose" marking violations and duties arises from (a) the plain language of 19 U.S.C. § 1304(i), which requires any exportation, destruction, or marking of unmarked goods to "be accomplished under customs supervision;" (b) the 1993 Mod Act, which implemented an "informed compliance" regulatory regime under which importers must ensure Customs is provided with accurate and timely information pertaining to imports; (c) 19 U.S.C. § 1484, which implements the requirement of "informed compliance" by expressly requiring an importer to provide information to Customs sufficient to show that imports comply with any "applicable requirement of law" and "may be released" from Customs custody and that enables Customs to "properly assess duties on the merchandise;" and (d) 19 U.S.C. § 1592, which makes clear that omissions relating to marking are material and thus marking violations and/or estimated marking duties are unquestionably encompassed within the type of information that 19 U.S.C. § 1484 requires to be disclosed at the time of entry.

---

[8]     *See also* Dist. Dkt. 27 at 11 (*Amicus* brief).

## II.    The FAC Satisfied The "Particularity" Standard Of Fed. R. Civ. P. 9(b).

The district court also denied leave to amend on grounds that the FAC failed

to satisfy the "particularity" standard of Fed. R. Civ. P. 9(b).  JA 51-101.  That

ruling is incompatible with this Court's recent decision in *Foglia*, 754 F.3d 153.

Rule 9(b) provides that a "party must state with particularity the

circumstances constituting fraud or mistake," but "malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  "The purpose of

Rule 9(b) is to provide notice, not to test the factual allegations of the claim."

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406,

414 n.2 (3d Cir. 2003).  In *Foglia*, this Court reiterated Rule 9(b)'s notice purpose,

and rejected a "'rigid' understanding" of the rule in the context of the FCA in favor

of merely requiring a relator to provide "particular details of a scheme to submit

false claims paired with reliable indicia that lead to a strong inference that claims

were actually submitted."  754 F.3d at 156.

Even under the more rigid approach adopted by certain other circuits,

however, CFI's allegations pass muster.  This approach requires relators to allege

"'representative samples' of the alleged fraudulent conduct, specifying the time,

place, and content of the acts and the identity of the actors."  *Id*. at 155.  CFI's

Complaint and FAC did just that through, *inter alia*, the inclusion of lengthy

spreadsheets documenting the imports that Victaulic had allegedly failed to mark

36

and intentionally evaded payment of marking duties on, including their date and

port of import, the specific importer of record, and other descriptive details.  JA

119-89, 341-55.

In any event, reasoning that "[i]nsofar as the purpose of Rule 9(b) is to

'provide[] defendants with fair notice of the plaintiffs' claims,'" *Foglia* held that

the less rigid approach would suffice.  *Id*. at 156-67.  Applying that more relaxed

standard to the case before it, this Court allowed the plaintiff's allegations to move

forward even though they were devoid of any specifics concerning the false claims,

alleging instead only a series of facts giving rise to a *possibility* of fraud.  *Id*. at

158.  Specifically, the relator alleged that a dialysis services company was

harvesting and reusing unused portions of the medicine Zemplar without

complying with certain safety recommendations for such multiple-use.  *Id*. at 157-

58.  The relator, however, did not allege any direct evidence that the defendant was

charging Medicare for more Zemplar than it was actually using.

Relator's complaint, therefore, offered two possible scenarios: either (1) the

defendant was charging the government as if it were using the medicine in single-

use fashion, while unlawfully profiting by harvesting the extra portions; or (2) the

defendant was only charging the Government for the actual volume of Zemplar

used, which would not have resulted in a false claim.  *Id*. at 158.  "While both

scenarios [we]re possible," this Court found it "unclear what would motivate the

second," noting that Medicare "provide[d] an opportunity for the sort of fraud alleged." *Id.* at 158. Although "a close case as to meeting the requirements of Rule 9(b)," this Court held the relator's allegations sufficient "to give [the defendant] notice of the charges against it," which conclusion was "further supported by the fact that [the defendant], and only [the defendant], has access to the documents that could easily prove the claim one way or another[.]" *Id.* at 158.

Here, the case is not close at all. Rather, the expert analysis of Dr. Wyner demonstrates that the only lawful alternative explanation for CFI's allegations is entirely implausible. JA 360 (concluding that the dramatic disparity between the portion of Victaulic's products that are imported and the miniscule fraction that have foreign markings is entirely "inconsistent with the hypothesis that Victaulic is marking its imports properly"). Even drawing every inference in Victaulic's favor, Dr. Wyner opines that CFI's "findings are so stark that the only conclusion one can possibly reach is that Victaulic is not properly marking its imports." JA at 362.

Moreover, as in *Foglia*, Victaulic has every incentive to not mark its foreign imports in order to pass them off as American-made and profit from the higher prices domestic pipe fittings command, while continuing to sell the foreign fittings for use in government Buy American Act projects. JA 325-26. And because Customs only inspects 1-2% of all foreign imports that come through U.S. ports, the opportunity for the evasion of marking duties is self-evident. In addition,

38

Victaulic itself "has access to the documents that could easily prove [CFI's] claim one way or another."  *See id.*; *see also* JA 313, 324, 330.

Consequently, under the reasoning of *Foglia*, the FAC puts Victaulic on adequate notice of the claims against it.  Indeed, the fraudulent scheme that CFI alleges is simple and will be easily proven (or disproven, if it can be) through straightforward discovery.  Hundreds of paragraphs of detailed allegations are not needed to support CFI's essential factual allegation—that Victaulic has imported pipe fittings that were not marked with their country of origin—which flows logically and persuasively from the FAC.  *See also United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009) (complaint satisfied Rule 9(b), even without exact billing numbers or amounts, because "[t]hat fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in [the complaint]" and "[i]t would stretch the imagination to infer the inverse").

The district court's analysis was unmoored from the actual standards of Rule 9(b) and *Foglia*.  Instead, the district court improperly made what were essentially factual findings about the credibility of, or weight to be given to, certain aspects to CFI's investigation.  The district court, for example, found CFI's product study "insufficiently reliable to support its conclusion that Victaulic failed to mark foreign products," taking issue with CFI's "subjective assessment" that "it was able to discern from photographs on the internet whether a given product was

39

marked." JA 91, 91 n.13.  Instead of accepting CFI's factual allegations as true, the district court substituted its own subjective judgment and determined that "reviewing pictures on eBay, which are one-dimensional rather than three-dimensional, does not reliably allow one to draw a conclusion as to whether the depicted product is marked." JA 92.  The district court, however, offered no basis for reaching this purely factual conclusion.

Rather, the district court simply rejected CFI's factual allegation that a marking, if present, would have been viewable in the eBay pictures given the availability of photos with different viewing angles that could be copied and enlarged.  *See* JA 320, 322, 356-363; *see also* JA 92 ("approximately two-thirds of the listings provide[d] some view of the inside or rim of a fitting").  Similarly, the district court rejected CFI's factual allegation that a review of Victaulic pipe fittings sold on eBay "included a representative national cross-section of Victaulic iron and steel pipe fittings," JA 318, concluding instead that it could not be reliably inferred that "foreign-made and U.S.-made Victaulic products [were] sold on eBay in the same ratio," JA 93.  But the district court again summarily reached this conclusion without any evidence or reasoning to support it, whereas CFI's conclusion is based on specific factual allegations entitled to the presumption of truth.  JA 317-19.

The district court also improperly rejected CFI's allegations stemming from its physical inspection of fittings. First, the district court found that CFI's purchase of nine Victaulic pipe fittings was not statistically significant, a conclusion that amounted to an implicit assertion by the district court that it could inject its own non-expert (and in this case incorrect) understanding of statistics as a basis for rejecting the FAC's factual allegations. JA 93 n.14. Next, the district court questioned a majority of CFI's findings because *some* of the fittings purchased with unclear photographs had "made in the United States" markings. JA 93.

Yet, not only did unclear photographs comprise less than 20% of the total listings CFI reviewed, the district court missed the salient point, namely that *none* of the fittings CFI purchased and physically inspected were marked with a foreign country of origin. JA 321-23, 395-96. In other words, CFI's sampling *confirmed* that CFI was *not* missing foreign-marked fittings, the only type that could have called into question CFI's analysis. Indeed, even assuming all unpurchased fittings with unclear photographs were, in fact, marked with a foreign country-of-origin, an unsupported assumption according to Dr. Wyner, "it still follows that an unrepresentatively small percentage of the total would be marked." JA 361-62.

Ultimately, the district court's opinion makes clear that it just did not believe in the statistical analysis done by CFI, and confirmed by Dr. Wyner, and would only have been satisfied by direct testimony from an insider, a type of evidence the

court viewed as inherently more reliable than statistics. JA 94-96. As this Court has explained, however, "neither the text of the FCA nor its legislative history suggests that non-insiders should never be able to bring qui tam actions." *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 523 n.23 (3d Cir. 2007); *see also Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044-45 (10th Cir. 2004) ("Our review of the relevant case law revealed no requirement that a relator be a corporate insider. Additionally, we can think of no valid reason for creating such a restriction.").

And as Dr. Wyner's analysis demonstrates, indirect evidence, such as the secondary market sampling conducted by CFI, is "standard practice," widely used, and a "powerful method[]" that can often be "more valuable, persuasive and ultimately more probative than direct evidence." JA 358-59. Indeed, *Foglia* directly addresses the distinction between direct and indirect evidence, rejecting the necessity of requiring "representative samples" of false claims as "one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." 754 F.3d at 156. Yet, this is exactly the type of detail the district court required.

Finally, the district court, in fact, *rejected* the single piece of "direct" evidence CFI became aware of following the filing of its Complaint, namely a

witness who recalled "a customer procuring Victaulic pipe fittings that the company represented were 100% U.S. manufactured," none of which "were marked with any foreign country name," but at the bottom of the box of inventory, "a packing list indicated that the products had originated from Poland." JA 324. The district court found this allegation insufficiently specific "without additional corroborating allegations." JA 95. Yet, neither Rule 9(b) nor any other part of the Federal Rules permits a court to disregard this type of specific factual allegation merely because it is not "corroborated." This reasoning further demonstrates how far the district court strayed from the Federal Rules and the teaching of *Foglia*.

## III.    The District Court's Dismissal "With Prejudice" and Subsequent "Undue Delay" Ruling Constituted An Abuse Of Discretion

The district court alternatively denied leave to amend on the basis of undue delay notwithstanding that CFI's request to amend was its first and occurred prior to any discovery. Under Fed. R. Civ. P. 15(a), leave to amend "shall be freely given when justice so requires." This rule "reinforces one of the basic policies of the federal rules—that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1473 (3d ed. 2015).

Accordingly, a first dismissal, when based on failure to plead sufficient facts, should almost always be accompanied by leave to amend. *See, e.g.*, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 212 n.6 (3d Cir. 2009) (dismissal "with

prejudice" and without leave to amend was error where complaint dismissed for lack of sufficient factual detail); *Philips v. County of Allegheny*, 515 F.3d 225, 236 (3d Cir. 2008) (finding error when complaint dismissed without opportunity to amend); *see also Runnion ex rel. Runnion v. Girl Scouts*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, . . . a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. . . . When a district court denies a plaintiff such an opportunity, its decision will be reviewed rigorously on appeal"); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). That is because "cases of clear futility at the outset of a case are rare," and it is only in such circumstances that a court might properly dismiss with prejudice. *Runnion*, 786 F.3d at 519.

For the reasons discussed above, amendment would not have been futile here. And a timely motion to amend filed under Fed. R. Civ. P. 59(e) should be analyzed under the same liberal "freely give" standard applicable under Rule 15(a). *See, e.g.*, *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) ("Where a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors."); *see also Runnion*, 786 F.3d at 520-22. Yet, the district court improperly dismissed CFI's Complaint with

prejudice, refusing to allow CFI even one opportunity to refine its allegations with the benefit of the district court's reasoning.

In denying leave to amend, the district court then created and applied its own "rule" that a plaintiff must either immediately file an amended complaint whenever a defendant files a motion to dismiss or risk being blamed for "undue delay" merely for waiting to first see how the court rules. This too is patently contrary to the liberal approach to pleading embodied in the federal rules and court practice:

> [T]he cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. . . . A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2015).

The district court's reasoning is as problematic as its result. First, the court found that CFI engaged in a "wait-and-see approach to pleading" because "CFI was on notice of the defects in its complaint" by virtue of Victaulic moving to dismiss and the district court referring to the Complaint as "bare bones" at the hearing. JA 70-71. But "delay alone is not sufficient to justify denial of leave to amend." *Arthur v. Maersk*, 434 F.3d 196, 204 (3d Cir. 2006) (citing *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir.1984)). Even "[u]nexcused delay" is not grounds for denial when "unaccompanied by real detriment to the defendant or the

judiciary." *Wausau Underwriters Ins. Co. v. Shisler*, 190 F.R.D. 341, 343 (E.D. Pa. 1999). Rather, "leave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur*, 434 F.3d at 204. And when this Court surveyed relevant case law, it uncovered only one appellate court (the Fifth Circuit) that had ever "approved of denial of leave to amend based on a delay of less than a year." *Id*.

Here, CFI sought leave to amend less than a year after Victaulic's answer or first responsive pleading was due, with the district court taking nine months of that time to rule after the parties had completed motion to dismiss briefing. This case is thus unlike *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 791, 803 (3d Cir. 2010), cited by the district court, which involved a request to add a new claim first made during summary judgment briefing after the case had been pending for seven years and the original complaint had been twice amended. Similarly, the plaintiff in *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 616-17 (3d Cir. 2013), sought to add a new claim in the midst of summary judgment briefing after four years of litigation and following provision of the relief requested in the original compliant.

Moreover, CFI's motives in seeking leave to amend were not dilatory or grounded in bad faith. *See Adams*, 739 F.2d at 868 ("The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiffs'

46

motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants."). The district court thus had before it the bulk of the factual allegations in the FAC at the time it ruled on CFI's Complaint, including the "factual information set forth in Ms. Wooding's declaration and further developed at the hearing," JA 70. And with respect to these factual allegations, the first time CFI had the benefit of the district court's concerns was upon receiving its order of dismissal with prejudice.

For this same reason, the district court's second basis for finding undue delay—that CFI imposed "an unwarranted burden on the Court" by "waiting for the Court to rule and then filing for leave to amend after entry of final judgment"—is likewise without merit. Of note, the district court did not find, nor did Victaulic even argue that it would have suffered prejudice if leave to amend had been granted. Yet, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978). "[I]f no prejudice is found as a result of the delay, the amendment will be allowed." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1488 (3d ed. 2015). And the opposing party "must do more than merely claim prejudice; 'it must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it

would have offered had the . . . amendments been timely.'" *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989).

With respect to burden on the courts, "the obligation of the district court . . . is to articulate the prejudice caused by the delay and to balance those concerns against the reasons for delay," while "bearing in mind the liberal pleading philosophy of the federal rules." *Cureton*, 252 F.3d at 273, 276. Where, as here, a plaintiff seeks leave to amend for the first time before an answer has even been filed, the judicial process is not prejudiced. Denial for leave to amend was especially unwarranted here given that CFI "prosecuted [th]is case in a fairly diligent manner." *Arthur*, 434 F.3d at 206. CFI's delay was not "so egregious nor unexplained as to warrant refusal of leave to amend." *Id.* at 204.

In response to Victaulic's Motion to Dismiss raising the public disclosure bar as a defense, CFI timely filed an opposition, which included a declaration describing its investigation. At the hearing on Victaulic's motion, the district court indicated a concern that the Complaint did not satisfy the standards of *Iqbal* and *Twombly*. JA 195. The district court stated, however, that it would consider the additional factual information provided in CFI's Declaration, which the FAC

largely duplicates.[9] JA 193-195. CFI's counsel also asked for leave to amend *if the district court concluded that the original Complaint failed to state a claim*, JA 229, something that did not happen *until the court ruled*. In its ruling, the district court considered CFI's Declaration, but identified *for the first time* what it believed were statistical weaknesses in CFI's product study. JA 45-47.

CFI promptly worked to address the district court's concerns by timely filing its Motion to Alter or Amend within the period proscribed by Fed. R. Civ. P. 59(e). CFI did not "withhold" the allegations in its FAC as a matter of strategy or to gain a tactical advantage. Rather, CFI was attempting in good faith to address the district court's stated concerns first articulated in its dismissal order. "Even if [CFI], with the benefit of hindsight, could have [filed this information earlier, its] failure to do so cannot be viewed as so egregious as to render amendment inequitable." *Arthur*, 434 F.3d at 206.

None of the cases cited by the district court are analogous to the facts at hand. Rather, all involved lengthy delays, typically of many years with discovery ongoing and prior grants of amendment, prejudice to the defendant, and/or findings

---

[9]     The district court's opinion could be read to suggest that CFI purposefully withheld information that it "could have presented to the Court prior to dismissal." JA 72. But the district court also acknowledges that the "FAC reasserts the same factual allegations set forth in Ms. Woodings's declaration and relies on many of the same exhibits." JA 72. Nothing in the FAC was ever "withheld" by CFI.

of futility affirmed by this Court.[10]  *Jang v. Bos. Scientific Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013), for example, involved a request to add a new claim and a finding by the lower court of prejudice to the defendant (neither of which are applicable here), but, in any event, ultimately reversed the dismissal on the pleadings and invited plaintiff "to file a new motion for leave to amend."  And in *Ca. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 163-65 (3d Cir. 2004), the plaintiffs had multiple opportunities to revise their legal theories following two successful dismissal motions, to the prejudice of defendant.

As the Supreme Court has long instructed, where "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  That is precisely the situation here.

---

[10] *See, e.g.*, *Schumann*, 769 F.3d at 849 (denying amendment after "many opportunities over the seven-plus years and five iterations of the complaint to plead facts indicating [relator] was original source"); *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266-67 (3d Cir. 2008) (denying amendment "long after the close of discovery" and three and a half years after notification that plaintiff had sued wrong parties); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004) (futility finding); *Cureton*, 252 F.3d at 272-74 (denying motion to add new claims following summary judgment three years after complaint; finding of prejudice to the defendant); *Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) (denying amendment as futile three years after initiation of action and following two prior amendments).

**IV.    The Original Complaint Also Stated A Claim For Relief, And The District Court's Dismissal Of That Complaint Was A Misapplication Of The "Plausibility" Standard**

Purporting to apply the "plausibility" standard of *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662, the district court dismissed CFI's original Complaint, even while treating it has having been *de facto* amended by the CFI Declaration. Just as it later did under Rule 9(b) with respect to the FAC, the district court improperly substituted its own opinions about the inferences to be drawn from CFI's investigation, treating the "plausibility" standard as giving it license to decide not only whether CFI had alleged marking violations by Victaulic, but also whether CFI could *prove* those allegations. The district court's analysis in that regard was both well beyond anything contemplated by the "plausibility" standard, and also wrong in other key respects.

If, however, the Court concludes that the "undue delay" finding was an abuse of discretion and agrees that the FAC states a claim for relief and satisfies Rule 9(b), then the Court need not reach this issue because the proper course would be to remand for further proceedings with the FAC as the operable pleading. Thus, it is only if the Court concludes that the district court properly denied leave to file the FAC because of "undue delay" that it would need to reach this issue.

A. **CFI's Allegations Easily Satisfy The Plausibility Standard Because They Demonstrate, To A 99.9% Degree Of Certainty, That Victaulic Has Sold Massive Quantities Of Unmarked Pipe Fittings**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555. The rule does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "In determining whether a complaint is sufficient, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

*Twombly* and *Iqbal* were intended to correct an overly liberal pleading standard whereby a defendant was required to show that there was "no set of facts" pursuant to which a plaintiff could be entitled to relief, leaving courts to imagine factual scenarios to deny dismissal, no matter how remote and implausible. In both cases, the crux of the Supreme Court's holding was that lawful "obvious alternative explanation[s]" for the defendant's conduct were equally likely (or more likely) even when accepting every factual allegation as true and drawing every reasonable inference in the plaintiff's favor. *Iqbal*, 556 U.S. at 682,

52

*Twombly*, 550 U.S. 567-68.  The Supreme Court thus held that a complaint must present at least "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

But the district court's holding here swings the pendulum to the other extreme, imposing a pleading standard higher than what CFI would be required to prove at trial and entirely inappropriate at the pleading stage.  This is directly contrary to *Iqbal* and *Twombly*, which emphasized that the "plausibility standard is not akin to a 'probability requirement.'"  *Iqbal*, 556 U.S. at 678.  A well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 556.  Rather, factual allegations need only be enough to rise "above the speculative level."  *Id*. at 555.  CFI's Complaint, both alone and as *de facto* amended by the CFI Declaration (which is how the district court treated it), more than satisfied this standard.  Not only does CFI allege more than sufficient facts to support a plausible inference of illegal conduct by Victaulic, CFI's allegations actually support this conclusion to a 99% degree of certainty according to Dr. Wyner.  JA 356-63.

Moreover, there are no "obvious alternative explanation[s]" for Victaulic's conduct.  Although acknowledging that "it is certainly possible that some of the unmarked pipe fittings for sale on eBay are foreign-made" JA 47, the district court

53

never identifies an equally likely explanation for the almost complete absence of foreign-marked pipe fittings found by CFI.  That is because there is none.  The purpose of CFI's product study was to objectively test whether CFI's own observations and other empirical evidence of which CFI was aware were true reflections of fraud being committed by Victaulic or were mere anomalies that could be explained by some other factor not indicative of fraud.  CFI's investigation found persuasive evidence of fraud.

Yet, the district court nevertheless summarily concluded that CFI had not shown that Victaulic had "failed to mark the vast majority of its imported pipe fittings," JA 47, pointing to various "flaws in CFI's eBay product study which g[a]ve the Court pause," JA 46-47 n.22, and criticizing CFI for not alleging additional facts tying specific products reviewed on the secondary market to foreign-made descriptions or characteristics.  Although the district court may have preferred direct evidence tracking Victaulic's imports into the U.S. supply chain, such evidence is not required.  And as Dr. Wyner opined, based on his review of CFI's Declaration, CFI's allegations "provide[] overwhelming evidence that a large fraction of imported Victaulic pipe fittings are either unmarked or improperly marked."  JA 357.

Moreover, the potential "flaws" that concerned the district court are inconsistent with CFI's own observations and, in any event, Dr. Wyner

demonstrates why such "small problems with [CFI's] sampling and data are of little impact.'" JA 317, 361. In fact, the dramatic disparity between the portion of Victaulic's products that are imported and the miniscule fraction that have foreign markings allowed Dr. Wyner to conclude with "99.9% confiden[ce] that Victaulic is improperly marking a significant portion of its imports." JA 360. The .01% chance that CFI's findings are the result of a highly unusual and unexpected anomaly in its collected data is not sufficient grounds to dismiss at the pleading stage under *Twombly* and *Iqbal*.[11]

### B.    The District Court Improperly Speculated That Victaulic May Have Paid Marking Duties, Erroneously Reversing The Plausibility Standard To Require CFI To Disprove A Remote Possibility Of Lawful Conduct.

The district court also improperly speculated that "Victaulic may have paid marking duties on those pipe fittings, if CBP discovered the marking failure after distribution." JA 47-48, 48 n.23. But here again, the district court draws hypotheses in Victaulic's favor, contrary to the proper pleading standard and without any factual basis to do so, ultimately requiring CFI to *prove* that Victaulic has not paid marking duties, regardless of how remote a possibility. In other

---

[11]    Although Dr. Wyner's analysis was included in the FAC, it largely relied on the factual information in CFI's Declaration and thus shows why the district court's dismissal with prejudice was in error.

words, the district court turned the plausibility standard on its head, imposing a

heightened pleading standard that required CFI to *disprove* a "sheer possibility"

that Victaulic had *complied* with the law.

Other circuit courts have rebuffed attempts to impose such a burden.

"Requiring a plaintiff to rule out every possible lawful explanation for the conduct

he challenges would invert the principle that the complaint is construed most

favorably to the nonmoving party and would impose the sort of 'probability

requirement' at the pleading stage which *Iqbal* and *Twombly* explicitly reject."

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) (internal

citations and quotation marks omitted); *see also New Jersey Carpenters Health

Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013);

*McCauley v. City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011).  A "[p]laintiff's

complaint may be dismissed only when the defendant's plausible alternative

explanation is so convincing that plaintiff's explanation is *im*plausible."  *Starr v.

Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).

Speculation that a defendant's conduct may have been lawful "is far from

the sort of concrete, obvious alternative explanation [a plaintiff] would need to

rebut in his complaint."  *Braden*, 588 F.3d at 597.  How could a plaintiff—required

to prove its case *at trial and after discovery* by only a "preponderance of the

evidence" or "clear and convincing evidence"—be required to "rule out"

alternative interpretations of the evidence *at the pleadings stage without any discovery*?  That would reverse the entire structure of the Federal Rules, requiring a plaintiff to have more evidence at the start than at the end.

The district court's mere speculation that Victaulic may have paid marking duties does not rise to an "obvious alternative explanation" that would merit dismissal of Plaintiff's claims.  Significantly, Victaulic never argued below that it had ever paid marking duties.  JA 330-31.  The district court's unsupported suggestion otherwise is not remotely convincing because the *only* way Victaulic could have imported unmarked pipe fittings in such large quantities alleged by CFI was if the company had evaded customs detection by concealing the unmarked nature of its imports and avoiding marking duties owed.  JA 329-30.  CFI's allegations are thus more than sufficient to reasonably infer that Victaulic has never paid marking duties, an inference Victaulic has not once disputed.

Tellingly, the district court did not deny CFI leave to amend for futility on Rule 8(a) grounds.  *See* JA 51-101 (analyzing the proposed FAC only under Rule 9(b)).  Indeed, the FAC shows the extreme to which the district court's pleading standard would require plaintiffs to go to avoid Rule 12(b)(6) dismissal as it included detailed factual allegations, as well as factual and expert evidence supporting its allegations, including thousands of spreadsheet entries detailing and compiling Victaulic's foreign imports, a summary spreadsheet and approximately

700 pages of eBay product listings documenting the findings of CFI's product study and basis for the same, and Dr. Wyner's expert analysis. JA 302-81. *Iqbal* and *Twombly* are not properly read to require such a level of proof under Rule 8(a). As discussed above, under *Foglia*, not even Rule 9(b) requires the heightened evidentiary showing the district court imposed on CFI here.

## CONCLUSION

The Court should reverse the district court's dismissal of the Complaint and/or reverse the district court's denial of the Motion to Amend and should remand for further proceedings.

Dated: August 7, 2015

Respectfully submitted,

  /s/Jonathan K. Tycko
Jonathan K. Tycko
Anna C. Haac
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Tel: 202-973-0900
Fax: 202-973-0950
jtycko@tzlegal.com
ahaac@tzlegal.com

Suzanne Ilene Schiller
MANKO, GOLD, KATCHER,
FOX LLP
401 City Avenue, Suite 500
Bala Cynwyd, PA 19004
Tel: 484-430-2359
sschiller@mgkflaw.com

*Attorneys for Appellant
Customs Fraud Investigations,
LLC*

## STATEMENT CONCERNING ORAL ARGUMENT
### (Local Rule 34(a))

CFI respectfully requests 20 minutes of oral argument in light of the important issues presented in this appeal, including, as a matter of first impression, whether the evasion of marking duties is actionable under the FCA following 2009 amendments and the proper interpretation and application of Fed. R. Civ. P. 8(a) and 9(b) in the context of an FCA claim.

# CERTIFICATE OF COMPLIANCE
## WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,913 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

     /s/Jonathan K. Tycko
Jonathan K. Tycko
*Attorney for Appellant*

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

In compliance with 3d Cir. L.A.R. 28.3(d), I hereby certify that at least one of the attorneys whose names appear on this brief is a member of the bar of this court or has filed an application for admission pursuant to 3d Cir. L.A.R. 46.1.

                                             /s/Jonathan K. Tycko

                                             Jonathan K. Tycko

                                             *Attorney for Appellant*

## **CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS**

I hereby certify that the text of the foregoing OPENING BRIEF OF

APPELLANT filed in electronic form is identical to the text in the paper copies.

　　/s/Jonathan K. Tycko　　
Jonathan K. Tycko
*Attorney for Appellant*

## **CERTIFICATE OF VIRUS CHECK**

I hereby certify that the Symantic Anti-virus detection program, version

12.1.5, was run on the filed electronic version of this brief and that no virus was

detected.

/s/Jonathan K. Tycko
Jonathan K. Tycko
*Attorney for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel hereby certifies that on this 7th day of August, 2015,

the foregoing OPENING BRIEF OF APPELLANT was served upon all counsel of

record via the Court's CM/ECF system.

_/s/Jonathan K. Tycko_

Jonathan K. Tycko

*Attorney for Appellant*

# ADDENDUM

**19 U.S.C. § 1304**
**Marking of imported articles and containers**

(a) Marking of articles

Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations--

(1)  Determine the character of words and phrases or abbreviations thereof which shall be acceptable as indicating the country of origin and prescribe any reasonable method of marking, whether by printing, stenciling, stamping, branding, labeling, or by any other reasonable method, and a conspicuous place on the article (or container) where the marking shall appear;

(2)  Require the addition of any other words or symbols which may be appropriate to prevent deception or mistake as to the origin of the article or as to the origin of any other article with which such imported article is usually combined subsequent to importation but before delivery to an ultimate purchaser; and

(3)  Authorize the exception of any article from the requirements of marking if—

(A) Such article is incapable of being marked;
(B) Such article cannot be marked prior to shipment to the United States without injury;
(C) Such article cannot be marked prior to shipment to the United States, except at an expense economically prohibitive of its importation;
(D) The marking of a container of such article will reasonably indicate the origin of such article;
(E) Such article is a crude substance;
(F) Such article is imported for use by the importer and not intended for sale in its imported or any other form;

(G) Such article is to be processed in the United States by the importer or for his account otherwise than for the purpose of concealing the origin of such article and in such manner that any mark contemplated by this section would necessarily be obliterated, destroyed, or permanently concealed;

(H) An ultimate purchaser, by reason of the character of such article or by reason of the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked to indicate its origin;

(I) Such article was produced more than twenty years prior to its importation into the United States;

(J) Such article is of a class or kind with respect to which the Secretary of the Treasury has given notice by publication in the weekly Treasury Decisions within two years after July 1, 1937, that articles of such class or kind were imported in substantial quantities during the five-year period immediately preceding January 1, 1937, and were not required during such period to be marked to indicate their origin: *Provided,* That this subdivision shall not apply after September 1, 1938, to sawed lumber and timbers, telephone, trolley, electric-light, and telegraph poles of wood, and bundles of shingles; but the President is authorized to suspend the effectiveness of this proviso if he finds such action required to carry out any trade agreement entered into under the authority of sections 1351, 1352, 1353 and 1354 of this title, as extended; or

(K) Such article cannot be marked after importation except at an expense which is economically prohibitive, and the failure to mark the article before importation was not due to any purpose of the importer, producer, seller, or shipper to avoid compliance with this section.

* * * *

(c) Marking of certain pipe and fittings

(1) Except as provided in paragraph (2), no exception may be made under subsection (a)(3) of this section with respect to pipes of iron, steel, or stainless steel, to pipe fittings of steel, stainless steel, chrome-moly steel, or cast and malleable iron each of which shall be marked with the English name of the country of origin by means of die stamping, cast-in-mold lettering, etching, engraving, or continuous paint stenciling.

(2)  If, because of the nature of an article, it is technically or commercially infeasible to mark it by one of the five methods specified in paragraph (1), the article may be marked by an equally permanent method of marking or, in the case of small diameter pipe, tube, and fittings, by tagging the containers or bundles.

* * * *

(i) Additional duties for failure to mark

If at the time of importation any article (or its container, as provided in subsection (b) of this section) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b) of this section) marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. Such duty shall be levied, collected, and paid in addition to any other duty imposed by law and whether or not the article is exempt from the payment of ordinary customs duties. The compensation and expenses of customs officers and employees assigned to supervise the exportation, destruction, or marking to exempt articles from the application of the duty provided for in this subsection shall be reimbursed to the Government by the importer.

(j) Delivery withheld until marked

No imported article held in customs custody for inspection, examination, or appraisement shall be delivered until such article and every other article of the importation (or their containers), whether or not released from customs custody, shall have been marked in accordance with the requirements of this section or until the amount of duty estimated to be payable under subsection (i) of this section has been deposited. Nothing in this section shall be construed as excepting any article (or its container) from the particular requirements of marking provided for in any other provision of law.

## 19 U.S.C. § 1484
## Entry of merchandise

(a) Requirement and time

(1) Except as provided in sections 1490, 1498, 1552, and 1553 of this title, one of the parties qualifying as "importer of record" under paragraph (2)(B), either in person or by an agent authorized by the party in writing, shall, using reasonable care—

(A) make entry therefor by filing with the Bureau of Customs and Border Protection such documentation or, pursuant to an authorized electronic data interchange system, such information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released from custody of the Bureau of Customs and Border Protection;

(B) complete the entry, or substitute 1 or more reconfigured entries on an import activity summary statement, by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation or, pursuant to an electronic data interchange system, such other information as is necessary to enable the Customs Service to—

(i) properly assess duties on the merchandise,

(ii) collect accurate statistics with respect to the merchandise, and

(iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.

* * * *

**19 U.S.C. § 1504**
**Limitation on liquidation**

(a)  Liquidation

(1)  Entries for consumption

Unless an entry of merchandise for consumption is extended under subsection (b) of this section or suspended as required by statute or court order, except as provided in section 1675(a)(3) of this title, an entry of merchandise for consumption not liquidated within 1 year from--

(A)  the date of entry of such merchandise,
(B)  the date of the final withdrawal of all such merchandise covered by a warehouse entry,
(C)  the date of withdrawal from warehouse of such merchandise for consumption if, pursuant to regulations issued under section 1505(a) of this title, duties may be deposited after the filing of any entry or withdrawal from warehouse,
(D)  if a reconciliation is filed, or should have been filed, the date of the filing under section 1484 of this title or the date the reconciliation should have been filed, whichever is earlier; or
(E)  if a reconfigured entry is filed under an import activity summary statement, the date the import activity summary statement is filed or should have been filed, whichever is earlier;

shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record. Notwithstanding section 1500(e) of this title, notice of liquidation need not be given of an entry deemed liquidated.

* * * *

**19 U.S.C. § 1505**
**Payment of duties and fees**

(a)  Deposit of estimated duties and fees

Unless the entry is subject to a periodic payment referred to in this subsection or the merchandise is entered for warehouse or transportation, or under bond, the importer of record shall deposit with the Customs Service at the time of entry, or at such later time as the Secretary may prescribe by regulation (but not later than 12 working days after entry or release) the amount of duties and fees estimated to be payable on such merchandise. As soon as a periodic payment module of the Automated Commercial Environment is developed, but no later than October 1, 2004, the Secretary shall promulgate regulations, after testing the module, permitting a participating importer of record to deposit estimated duties and fees for entries of merchandise, other than merchandise entered for warehouse, transportation, or under bond, no later than the 15 working days following the month in which the merchandise is entered or released, whichever comes first.

* * * *

**19 U.S.C. § 1592**
**Penalties for fraud, gross negligence, and negligence**

(a)  Prohibition

(1)  General rule

Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence—

(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of--
(i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or
(ii) any omission which is material, or
(B) may aid or abet any other person to violate subparagraph (A).

(2)  Exception

Clerical errors or mistakes of fact are not violations of paragraph (1) unless they are part of a pattern of negligent conduct. The mere nonintentional repetition by an electronic system of an initial clerical error does not constitute a pattern of negligent conduct.

(b)  Procedures

(1)  Pre-penalty notice

(A)  In general

If the Customs Service has reasonable cause to believe that there has been a violation of subsection (a) of this section and determines that further proceedings are warranted, it shall issue to the person concerned a written notice of its intention to issue a claim for a monetary penalty. Such notice shall--

(i) describe the merchandise;

(ii) set forth the details of the entry or introduction, the attempted entry or introduction, or the aiding or procuring of the entry or introduction;
(iii) specify all laws and regulations allegedly violated;
(iv) disclose all the material facts which establish the alleged violation;
(v) state whether the alleged violation occurred as a result of fraud, gross negligence, or negligence;
(vi) state the estimated loss of lawful duties, taxes, and fees, if any, and, taking into account all circumstances, the amount of the proposed monetary penalty; and
(vii) inform such person that he shall have a reasonable opportunity to make representations, both oral and written, as to why a claim for a monetary penalty should not be issued in the amount stated.

(B)  Exceptions

The preceding subparagraph shall not apply if—

(i) the importation with respect to which the violation of subsection (a) of this section occurs is noncommercial in nature, or
(ii) the amount of the penalty in the penalty claim issued under paragraph (2) is $1,000 or less.

(2)  Penalty claim

After considering representations, if any, made by the person concerned pursuant to the notice issued under paragraph (1), the Customs Service shall determine whether any violation of subsection (a) of this section, as alleged in the notice, has occurred. If the Customs Service determines that there was no violation, it shall promptly issue a written statement of the determination to the person to whom the notice was sent. If the Customs Service determines that there was a violation, it shall issue a written penalty claim to such person. The written penalty claim shall specify all changes in the information provided under clauses (i) through (vi) of paragraph (1)(A). Such person shall have a reasonable opportunity under section 1618 of this title to make representations, both oral and written, seeking remission or mitigation of the monetary penalty. At the conclusion of any proceeding under such section 1618, the Customs Service shall provide to the person concerned a written statement which sets forth the final determination and

the findings of fact and conclusions of law on which such determination is based.

(c)  Maximum penalties

    (1)  Fraud

A fraudulent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed the domestic value of the merchandise.

    (2)  Gross negligence

A grossly negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed--

        (A)  the lesser of—

            (i) the domestic value of the merchandise, or
            (ii) four times the lawful duties, taxes, and fees of which the United States is or may be deprived, or

        (B)  if the violation did not affect the assessment of duties, 40 percent of the dutiable value of the merchandise.

    (3)  Negligence

A negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed—

        (A)  the lesser of—

            (i) the domestic value of the merchandise, or
            (ii) two times the lawful duties, taxes, and fees of which the United States is or may be deprived, or

        (B)  if the violation did not affect the assessment of duties, 20 percent of the dutiable value of the merchandise.

\* \* \* \*

**31 U.S.C. § 3729**
**False claims**

(a)  Liability for certain acts.--

    (1)  In general.--Subject to paragraph (2), any person who--

* * * *

        (G)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

    is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * * *

(b)  Definitions.--For purposes of this section--

* * * *

    (3)  the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

**31 U.S.C. § 3729**
**False claims**
**(pre-FERA version)**

(a)  Liability for certain acts.--Any person who—

* * * *

    **(7)**  knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for . . .

**Federal Rule of Civil Procedure 8**
**General Rules of Pleading**

(a)  Claim for Relief. A pleading that states a claim for relief must contain:

(1)  a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2)  a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3)  a demand for the relief sought, which may include relief in the alternative or different types of relief.

* * * *

# Federal Rule of Civil Procedure 9.
## Pleading Special Matters

* * * *

(b)  Fraud or Mistake; Conditions of Mind.  In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

* * * *

## Federal Rule of Civil Procedure 15
## Amended and Supplemental Pleadings

(a)  Amendments Before Trial.

(1) *Amending as a Matter of Course.*  A party may amend its pleading once as a matter of course within:

(A)  21 days after serving it, or
(B)  if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2)  *Other Amendments.*  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

* * * *